

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 15, 2021

**BY ECF**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: *United States v. Juan Marcos Matos Ruiz*, 21 Cr. 330 (JSR)

Dear Judge Rakoff:

  The Government respectfully submits this letter in connection with the sentencing of Juan Marcos Matos Ruiz (the "defendant") in the above-captioned matter, currently scheduled for September 23, 2021 at 4:00 p.m.

### I. Offense Conduct

  The defendant is one of a network of individuals who participated in a scheme to launder what they believed to be criminal proceeds by various methods. One of those individuals, Jose Morely Chocron, was identified to law enforcement by a confidential source ("CS-1") in or around January 2019. Beginning in May 2019, CS-1, another confidential source ("CS-2"), and two undercover agents ("UC-1" and "UC-2") provided Chocron and his associates – Isaac Schachtel, the defendant, Juan Carlos Balaguera Villamizar, and Alfredo Lichoa – with more than $1.5 million in funds that they represented were the proceeds of bribe payments to Brazilian public officials, and which the defendants agreed to launder.

  Chocron initially negotiated with the CSes and arranged with the CSes and UCs to accept cash payments in the United States and wire the funds, minus a commission, bank accounts specified by the FBI. After an initial "test" transaction in May 2019, on June 18, 2019, CS-1 and CS-2 contacted Chocron to make arrangements to deliver an additional $50,000 in cash. Chocron was not in the United States at the time and instead instructed CS-1 and CS-2 to deliver the cash in two portions to two different couriers, which they did. Within the next ten days, a portion of the $50,000 was wired, via four different bank accounts, to a bank account controlled by the FBI.[1] Two of those wires, totaling $14,995, originated from a bank account in the name "Matos Brothers LLC" – the defendant's company – and the associated OBI (originator to beneficiary information) field included invoice numbers, despite the fact that neither CS had purchased anything from Chocron, the defendant, or Matos Brothers.

---

[1] The total amount returned was short the agreed upon amount by approximately $6,000.

On August 13, 2019, CS-1 and CS-2 introduced to Chocron an undercover FBI agent, UC-1, who was posing as a more sophisticated money launder than CS-1 or CS-2, who was interested in laundering large amounts of funds received as bribe payments by corrupt Brazilian politicians. Chocron and UC-1 arranged for UC-1 to deliver $250,000 in cash to Chocron and Balaguera Villamizar to be laundered. Subsequently, on November 5, 2019, UC-1 met with Schachtel at a restaurant in Manhattan. During that meeting, Schachtel introduced himself as a partner of Chocron's in the laundering of illicit proceeds and UC-1 explained to Schachtel the purported illicit origin of the funds being laundered, as he had previously explained to Chocron and Balaguera Villamizar. On November 15, 2019, UC-1 delivered $150,000 in cash to Schachtel. These funds, minus a 17% commission, were returned to several bank accounts controlled by the FBI, including via six transactions[2] originating from bank accounts held by Matos Brothers LLC, and a seventh transaction originating from an account controlled by one of the defendant's associates. Several of these transactions were accompanied by an OBI referencing a nonexistent invoice number.

Between December 5, 2019 and January 15, 2020, UC-1 delivered a total of $491,000 to Schachtel, over three transactions, for Schachtel to launder. Over the course of two months, $419,025 was returned to bank accounts controlled by the FBI, over twelve transactions originating from accounts controlled by the defendant and his associate. Many of the accompanying OBIs contained references to invoices or cargoes.

Following these transactions, on February 20, 2021, the defendant and UC-1 met in person, after being introduced by one of the CSes. During that meeting, the defendant confirmed that he controlled the Matos Brothers bank accounts and UC-1 described the purported source of the funds that Chocron, Schachtel, and the defendant had been laundering:

| | |
|---|---|
| **UC-1:** | I'm a broker. I help those politicians from Brazil.. |
| **MATOS RUIZ:** | Of course! |
| **UC-1:** | To bring their money over here and laundry their money. |
| **MATOS RUIZ:** | Of course! |
| **UC-1:** | That is my role. |
| **MATOS RUIZ:** | Of course! |
| **UC-1:** | They haven't had a problem in 20 years. We haven't have any type of problems. We work with honest people and . . . we already have our system. The people say, I need. . . have someone in Brazil . . . someone who can help you…I don't need that. |
| **MATOS RUIZ:** | Uh-huh! |

---

[2] In addition, one transaction, conducted via check from a Matos Brothers account, was returned for insufficient funds.

| | |
|---|---|
| **UC-1:** | I don't need that. I need the help here. |
| **MATOS RUIZ:** | Here! |
| **UC-1:** | The people – the people want things-- |
| **MATOS RUIZ:** | In the United States. |
| **UC-1:** | . . . These $100,000.00 that I have right now came – came - came from a bribe. I have family members, I have cousins who are marry to politicians over there in Rio de Janeiro. |
| | \*    \*    \* |
| **UC-1:** | Those people mainly work at the small municipalities up north, in cities up north from Rio de Janeiro. |
| **MATOS RUIZ:** | From Rio, okay. |
| **UC-1:** | These $100,000.00 especially for the Carnaval. The people that want to open a Jet Ski place at one of Buso's beaches. |
| **MATOS RUIZ:** | Oh, yes. |
| **UC-1:** | Obviously, had to… |
| **MATOS RUIZ:** | Move. |
| **UC-1:** | And-and-an that is nothing . . . $100,000.00. |
| **MATOS RUIZ:** | That was just for the permit-that was just for the permit. |
| **UC-1:** | That was just for the permit. But $100,000.00, do you know how many Americans are over there right now? |
| **MATOS RUIZ:** | Of course! How much of a profit they get out of there, [UC-1]. |

The next day, UC-1 delivered $100,000 in cash to the defendant. That same day, $85,000 was transferred to two bank accounts controlled by the FBI, via two bank accounts in the names of companies affiliated with one of the defendant's associates.

The defendant and UC-1 arranged an additional money laundering transaction in late February 2020. This time, the defendant arranged for the expected funds ($250,000) to be transferred prior to receiving cash from UC-1. On March 5, 2020, the funds were wired to bank accounts controlled by the FBI in four transactions, one from an account held by Matos Brothers, the other three from accounts controlled by the defendant's associate. The defendant was arrested a few days later.

## II. Procedural History

The defendant was charged by complaint on February 27, 2020 and arrested on March 9, 2020 in the Southern District of Florida. On May 13, 2021, the defendant plead guilty, pursuant to a plea agreement (the "Plea Agreement"), to a one-count information (the "Information"), charging him with conspiracy to commit money laundering, in violation of Title 18, United State Code, Section 1956(h). In the Plea Agreement, the parties calculated the defendant's Criminal History Category as I, and the applicable Guidelines offense level as 21, resulting in a Guidelines range of 37 to 46 months' imprisonment.

In the PSR, finalized on July 30, 2021, the Probation Office ("Probation") conducted the same Guidelines calculation and also concluded that the applicable Guidelines range was 37 to 46 months' imprisonment. PSR at 23. Probation recommended a sentence of 18 months' imprisonment followed by one year of supervised release. *Id.*

## III. Discussion

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In this case, in determining what sentence would comply with the mandate of Section 3553(a), the Government asks the Court to consider in particular the nature and circumstance of

the offense and the role the defendant played in the larger scheme, the sentences already imposed on the defendant's coconspirators, ███████████████████████████████
███████

      The defendant, in order to make money, facilitated the transfer of approximately $900,000 into undercover FBI bank accounts. The defendant joined the scheme at the direction of Chocron and Schachtel, and initially may not have been aware of precise nature of the first transactions or the terms under which they were conducted. However, the defendant soon became aware that the funds in question had been represented to his coconspirators to be the proceeds of bribe payments that had been made to Brazilian public officials – a representation that was later made to the defendant directly by UC-1. While the funds in question ultimately were not actually criminal proceeds, the defendant was eager to accept them, going so far as to cut Chocron and Schachtel out of future transactions and solicit business from UC-1 directly. In connection with these later transactions, the defendant personally accepted $100,000 in cash, and expected to receive more, prepaying approximately $250,000 into the FBI's bank account days before his arrest..

      In terms of his involvement in the money laundering scheme, the defendant is positioned between Chocron, who laundered approximately $565,000 over four transactions and was a hub of the conspiracy, and Lichoa, who accepted approximately $50,000 with the intent of laundering it, but ultimately did not complete the transaction. While the defendant and Balaguera Villamizar each accepted cash and arranged for wires or other transfers into the FBI's accounts, the defendant was responsible for the movement of a larger value in funds: Approximately $903,620 was transferred from accounts controlled by the defendant or his associate; while Balaguera Villamizar handled just under $550,000.

[redacted]

Respectfully submitted,

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

By: /s/
Benet J. Kearney / Andrew C. Adams /
Sarah Mortazavi
Assistant United States Attorneys
(212) 637-2260 / 2340 / 2520

cc: Sherleen Mendez, Esq. (by email and ECF)
Bruce Lehr, Esq. (by email and ECF)
Probation Officer Pamela Flemen (by email)